UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| **WILLIAM KIBBEY STOVALL,** | § § § | |
| **Plaintiff** | § § | |
| v. | § § | CIVIL ACTION NO. 4:23-cv-00629 |
| **RAYTHEON COMPANY, a/k/a RAYTHEON TECHNOLOGIES,** | § § § § | |
| **Defendant** | § § | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND
BRIEF IN SUPPORT**

NOW COMES William Kibbey Stovall ("Stovall" or "Plaintiff"), and files this his Response (the "Response") to Defendant Raytheon Company's Motion for Summary Judgment (the "Motion") and would respectfully show the court as follows:

Plaintiff sued Raytheon Company, a/k/a Raytheon Technologies ("Defendant"), alleging a cause of action for age discrimination in connection with the termination of Stovall's employment after 26 years of employment with Defendant.

**I.**

**EVIDENCE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Exhibit "A" - Affidavit of William Kibbey Stovall.

1

## II.

## FACTS

1.      Stovall is a man in his mid-fifties who was fired by Defendant in May of 2022 after more than twenty-six years of experience working for Defendant. Stovall, who holds a Ph.D. in Chemistry from the University of California, Los Angeles (UCLA), began his employment with Defendant in December of 1995 when he was hired as a multi-disciplined engineer in the Materials and Processes (M&P) department of the Hughes Aircraft Company in El Segundo, California. Raytheon acquired Hughes Aircraft Company in 1997 and subsequently merged with United Technologies to form the current Raytheon Technologies in 2020. Stovall was hired at the engineering salary grade E04 and was promoted twice, to E05 in 1998 and to E06 in 2007.  At the time of his termination, he was an E06 level Senior Principal Multi-Disciplined Engineer making $196,417.00 per year plus bonuses and benefits. There were tasks that Stovall performed that no other employee of Defendant at the McKinney location was qualified to perform.

2.      In late 2018, Stovall's request to transfer to Defendant's facility in McKinney, TX (Collin County) was approved as a lateral move by the Department Head over both the El Segundo and McKinney M&P sections, Keith Kirchner.  The McKinney M&P section needed someone with Stovall's experience and specialized knowledge to help the McKinney factory overcome relevant problems.  The transfer relocation costs were fully paid by Defendant and Stovall joined the McKinney M&P Section full time in February of 2019.  In early 2020, while Stovall was employed by Defendant in Collin County, the McKinney M&P Section was reorganized to report to a different department, led by a recently promoted Asian male, Brandon Yamauchi.  Stovall noticed that he had ageist characteristics and appeared to favor younger workers while having a difficult time

dealing with older workers.

3. Stovall's abrupt termination on May 19, 2022 was done without explanation beyond a statement that he had violated Raytheon's sexual harassment policies, and was done in person by the Department Manager, Yamauchi, with corporate Human Resources officer Matt Bauer joining by teleconference  The incident which had started the investigation leading to the termination occurred on April 1, 2022, when a young, openly gay male co-worker accused Stovall of sexual harassment because Stovall had lightly tapped his backside with a cafeteria tray to get his attention to say a friendly "hello".  This was done in a crowded cafeteria, and Stovall had no idea that the employee would react so negatively to the jesture.

4. Stovall was shocked by the false allegations against him when he was told he was being investigated for sexual harassment..  He believed that the employee and he were on friendly terms, and there had never been any statements or behaviors to suggest the possibility of sexual attraction between them.  Neither had the employee ever expressed any discomfort to Stovall, regarding feeling harassed by Stovall prior to that moment.  In fact, Stovall had been aware since 2019 that this employee was openly gay in what Stovall knew was a traditionally male-dominated industry in a more traditional local culture and Stovall had made a conscious effort to both treat him as he would any other younger employee. Stovall immediately apologized to the employee when he realized that the employee was reacting negatively to what happened.

5. It became known within days of the April 1 incident that the complaining employee had formally given notice of leaving Raytheon to accept a job at another local aerospace company.  This means that at the time of the incident he had already decided to leave Raytheon and had likely been actively seeking other employment for many weeks.

6.      The sole telecom interview performed by Raytheon's internal Employee Relations representative with Stovall in mid-April 2022 suggested to him that the other coworker present with the complaining employee during the April 1 cafeteria incident had also made false claims of long-term sexual harassment against Stovall.  Raytheon's response to Stovall's EEOC complaint confirmed this.  This second employee was a young woman in Stovall's section who had recently become good friends with the original complainant.  She had worked with Stovall since 2020 and had never expressed any discomfort around Stovall, to the point of coming to Stovall's house twice to choose spare household goods Stovall and his wife were offering to the younger members of Stovall's section (Stovall even helped her move a truckload of her chosen items into her apartment before promptly leaving).  Raytheon's EEOC response only provided direct harassment claims from these two individuals, the disgruntled gay complainant and his female good friend.  The few other character complaints listed therein are either hearsay from these same two accusers (e.g. complainant claims to have heard another employee complain about Stovall) or non-specific generic complaints by unnamed co-workers.

7.      The department manager fired Stovall on May 19, 2022, without following Defendant's normal policies for re-training and without giving him any warning or opportunity to show improvement against alleged bad behaviors.  At the time of his firing no explanations for what justified the decision for termination were provided, even though they were asked for by the Plaintiff.  The later EEOC response claims the termination was justified because Yamauchi didn't believe Stovall had any remorse for his actions (clearly proving how the "investigators" and Yamauchi begged the question of his guilt from the beginning) completely ignoring Stovall's documented and immediate email response and apology on April 1 to express his personal sorrow

that the young man felt as he did for what Stovall absolutely did not intend to cause. Similarly, the so-called "investigation" and evaluation by Yamauchi and Human Resources appeared to always accept that the accuser's versions of events were true and that any reasonable person would agree with the accusers' feelings. Although Stovall pointed out the false and misleading characterization of events as sexually harassing as alleged by the two complaining employees, the company chose to ignore its own employee training on how to recognize harassing behavior.

8.  The Department manager and Defendant consistently treated younger workers more favorably than older workers. Examples of this involved Sophia Ho, Michael Hiefner, Bianca Avila, and Megan Bolf, all recent college graduates. The section manager who had replaced Krause in 2021, Kelly Lucy, was especially protective and deferential to Jonathan Giddens, a non-degreed tech in his early 20's she repeatedly gave responsibility for engineering level tasks completely outside his professional training and experience and she continually ignored warnings by Krause and Stovall that Giddens was unqualified and making potentially dangerous decisions. Both the Department and Section Managers favored the younger workers when issues arose concerning their behavior, when assignments were being given or when credit for good work was being given.

9.  Stovall's position was not replaced in its entirety but was divided into multiple individual tasks with some tasks assigned to existing younger co-workers, some assigned to a new younger female staff person and some high-level, specialized functions no longer being conducted by the department.

10. Yamauchi himself was later demoted for unprofessional conduct and moved out of the department, but was allowed by Raytheon to retain his salary and benefits as well as continuing to work for Raytheon without any disruption in his employment. Yamauchi had a history of favoring

younger workers over older ones. Examples include the following:

(1) Sophia Ho a recent college graduate (2019)– rejected legitimate criticism and guidance from the Section Manager (Kurt Krause, age mid-40's) to improve her performance in the M&P group and appealed to Division Manager Yamauchi to simply reassign her to a different group.  She was reassigned (Mid 2020).  She also accused SM of sexual harassment, but HR found no basis.

(2) Michael Hiefner, a recent college graduate (2019)- rejected legitimate criticism and guidance from the Section Manager Kurt Krause to improve his performance in the M&P group and appealed to Yamauchi to reassign him to a different group.  He was reassigned (Mid 2020).

(3) Megan Bolf, a recent college graduate but hired initially (2019) to help retain her husband within the company and department, objected to legitimate criticism from the Section Manager Kurt Krause over her efforts to direct a project in a way that Krause did not approve. She shortly thereafter left the company (2021) and accused Krause of sexual harassment to Yamauchi in her exit interview. HR reviewed and found no basis.  Yamauchi investigated (largely relying on commentary from Ho and Hiefner) on his own but made no officially different conclusion, but did subsequently remove Krause from his Section Manager position.  Bolf was rehired by Yamauchi in 2022 with her new position still pending

(4) Jonathan Giddens (late 20's) a non-degreed tech joined the group in 2021 and while having little technical experience was allowed to lead several technical tasks he was not qualified for, and in one case his travel and interactions with the El Segundo M&P group (of which Stovall was a member for 24 years and was familiar with the people and capabilities of that group) was hidden from Stovall and other group members.  This travel (May 2022) was approved by the current

6

Section Manager, Kelly Eddings Lucy (age ~57).

(5)     Kelly Lucy was moved into the Section Manager role when Krause was moved out (2021), and was already at a salary grade where she qualified for the higher "Results Based Incentive" bonus structure.  Yamauchi expressed a desire that she should be demoted upon taking the SM position and therefore lose the RBI bonus.

(6)     Jon Giddens in Feb 22 was also supported by Yamauchi to lead a technical task over the two more senior and experienced people (Krause and Stovall) and furthermore expected the senior people to not assist with insight or advice unless specifically asked.

(7)     Bianca Avila (recent college graduate 2021) made a technical error (early 2022) that Yamauchi asked Kurt Krause to come in on an emergency basis and fix, but then blamed Krause for Avila's original error after having been given clear command by Yamauchi to not help Avila in the first place.

(8)     The engineering group had a competition to design an improvement to a holding/fixturing cart used in the factory. Jesse Dearden (an experienced mechanical engineer in his early 40's) was largely responsible for the winning design, but Yamauchi gave half the credit/reward to Bianca Avila for only a minor contribution.

11.     Stovall's previous Section Manager, Kurt Krause, was also accused of improper conduct, but he was not fired on the first allegation. Instead, he was allowed to keep his job and was not fired until additional complaints were made against him. Although Krause was demoted by Yamauchi after his first investigation by Human Resourses and further investigation by Yamauchi for sexual harassment of a young female employee, he was not terminmated. He was later investigated again by Human Resourses and Defendant's lawyers based on new allegations (this one also for sexual

7

harassment of a former young female emp-loyee) for which he was ultimately fired. Both Krause and Yamauchi were approximately 10 years younger than Stovall.

12. Stovall was not placed on a Performance Improvement Plan, as employees with employment issues at Raytheon often are, but was fired outright with no progressive discipline and no chance to prove that he could satisfy Defendant's requirements, as he had done for 26 years. He also was fired after only one cursory investigation against him, while younger workers survived multiple allegations against them before they were fired.

13. Stovall did not commit "sexual harassment," as that term is defined in the law. Although he was accused of giving compliments to female workers on new haircuts and/or new clothing, nothing he ever said was of a "sexual" nature (he never mentioned private body parts or sexual acts or wanting to have sex with anyone, etc. rather they were merely ordinary social niceties).

14. Defendant states that Bianca Avila complained about Stovall in the investigation. However, she picked up furniture from Stovall's private home and had Stovall follow her back to her private home to take furniture upstairs for her. This does not seem to be a person afraid of Stovall or who was experiencing harassment from him.

15. Defendant claimed in its EEOC position statement that a person no longer with Defendant (Deepali Patel), stated that Stovall made comments on who was "hot." This absolutely never happened and Stovall never even speaks in such a manner and adamantly denies describing anyone as hot at the time or later to HR during his interview. In any event it is complete hearsay as well as being completely unfounded and untrue.

16. The investigation of Stovall was conducted by an employee named Mina Okafor. The investigation was clearly deficient. Okafor failed to interview the entire department or anyone from

El Segundo where Stovall had worked for many years. She failed to interview Krause, Stovall's previous Section Manager. She also took false accusations as "facts" without conducting any research as to the accuracy or the motivation of the speakers, such as a phone call made by an employee outside of the department, Pete Amadon, claiming Stovall said that they "only hire hot chicks", which Stovall has adamantly denied. Amadon did not claim he witnessed, nor did he name any other person that specifically witnessed this alleged statement. Had Okafor done a thorough investigation she would have discovered that, like Avila, Amadon's statements were motivated by his friendship with Gruss and not based on actual facts. She also repeatedly took innocuous compliments and friendly salutations completely out of context such as mentioning a nice haircut or outfit or using the term "lovely" and falsely attributed sexual motives that were not present or evidenced.  In fact, even Avila did not claim any sexually explicit language used by Stovall towards her and instead hid behind vague allegations that he made comments about her "hair, physique and general appearance" – all a far cry from constituting sexual harassment and clearly showing Okafor's  obvious bias. Stovall never admitted nor did he "smack" Gruss' buttocks and has consistently stated as such in his emails to Gruss despite Gruss' attempts to make it sound sexual and to be an actual "touching".  Kelly Lucy never "coached" Kibbey (as claimed only in Okafor's declaration and not Lucy's) and Stovall would challenge her on producing any emails or file notes or anything put into his personnel file that would show otherwise.  Musgrove, another witness interviewed by Okafor, gave no specifics on anything he claims Stovall said other than to use the word "darling" for one prior engineer who never made any formal complaints about Stovall to HR including when she exited Raytheon.  Further, Okafor failed to ask Avila any questions about her relationship with Gruss or to discover she was best friends with him and not a reliable source of

information. Stovall's personnel file for 25 years is SPOTLESS except for this one trumped up incident that was wildly and intentionally mischaracterized that Yamauchi used as an excuse to immediately terminate Kibbey due to his own age discrimination against him. Any other person would have received additional training and an opportunity to improve. It was Yamauchi alone that made the false determination that Stovall was "untrainable" due to his desire to discriminate against him as an older worker.

17. Yamauchi's declaration repeats the false statements made by Okafor about things that never happened with Avila and which Stovall never admitted. Even Avila did not say anything specific that Stovall had said to her about her "physique" or "dress" that made her feel uncomfortable. Also, she had never reported anything to HR before the incident with Gruss in the cafeteria. Yamauchi admits that Okafor only interviewed Gruss, Avila and Musgrove, stating "limited number of witnesses interviewed." Clearly, Yamauchi failed to push for a more thorough investigation, and, apparently no one else in the organization did either. Further, Yamauchi specifically described Stovall as "OLD school" to Okafor per her declaration and waited more than six weeks from when the incident occurred to terminating Stovall (misstating the actual termination date in his declaration) and did so at a time when Stovall's direct supervisor, Section Manager Lucy, was on vacation for several weeks. Clearly, if Stovall's conduct was so clearly outrageous and unable to be remedied, Yamauchi would have terminated him much sooner (and perhaps his reason for repeatedly misstating the actual date of the termination discussion). This suggests that Yamauchi and the company merely saw this incident as a convenient excuse to remove Stovall so that they could replace him with younger, lower paid employees and avoid having to pay any severance for laying him off.

### III.

### THE MOTION

18.     Defendant alleges in the Motion that Stovall cannot bring his suit because it is barred by the various theories.

### IV.

### LEGAL STANDARD

19.     Under Rule 56(a), the Court can grant summary judgment if the Court finds that there is no genuine dispute as to any material fact. This means that the movant must show that there is no true, material factual dispute for a factfinder to resolve. This Court has stated: "The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enterprises, Inc. v. American Hardware Mut. Ins. Co.,* 655 F.2d 598, 602 (5th Cir.1981) (citations omitted). The substantive law identifies which facts are material. *Anderson.* 477 U.S. at 248.

20.     The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See id.* at 247. If the movant bears the burden of proof on a claim or defense on which it is moving for summary

judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986). But if the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex,* 477 U.S. at 323, 325; *Byers v. Dallas Morning News, Inc.,* 209 F.3d 419, 424 (5th Cir.2000). Once the movant has carried its burden, the nonmovant must "set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). The nonmovant must adduce affirmative evidence. *See Anderson,* 477 U.S. at 257." *McCoy v. Pfizer, Inc.*, 2010 WL 3365284, (E.D. Sherman 2010).

21. A plaintiff should not be deprived of his day in court if there is the slightest doubt to any of the issues set forth in the movant's motion for summary judgment. *See Kolb v. Texas Emp. Ins. Ass_n*, 585 S.W.2d 870, 872-873 (Tex. Civ. App. -- Texarkana 1979, writ ref_d n.r.e.). In addition, summary judgment should not be granted when such issues are inherently intended for the finder of fact to resolve. *See Id.* Finally, when determining whether summary judgment is proper, only the specific grounds set forth in the motion for summary judgment should be construed by the Court in considering summary judgment. *See Valles v. Texas Comm_n on Jail Standards*, 845 S.W.2d 284 (Tex. App. -- Austin 1992, writ denied).

## V.

## PLAINTIFFS' RESPONSE TO MOTION

### 1. Stovall can establish a prima facie case of Age Discrimination.

22. Defendant alleges in the Motion Stovall cannot establish a prima facie case of Age Discrimination. Defendant argues that Stovall cannot prove a *prima facie* case of age discrimination. The concept of proving a *prima facie* case arose out of the burden shifting analysis

announced in the seminal case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that analysis, a plaintiff must first establish a *prima facie* case by showing (1) that he was discharged; (2) he was qualified for the position from which he was discharged; (3) he was within the protected class at the time of the termination; and (4) he was either (i) replaced by someone outside the protected class, (ii) replaced by someone younger, or (iii) otherwise discharged because of his age. *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004). The Fifth Circuit has held that, in order to prove a *prima facie* case, a plaintiff need only make a very minimal showing. See *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996).

23. Stovall's Complaint and evidence allege that he is over the age of forty (40) years (age 55); that he had a proven history of performance that led to promotions over the 27-year history of his employment at Defendant, that he was abruptly fired without explanation beyond a cursory statement that he had violated Defendant's sexual harassment policies (which Stovall alleges were false accusations) and that younger workers were more favorably treated than older workers like Stovall when issues arose concerning their behavior or their receipt of assignments or awards. He also pled that the Department Manager that favored younger workers over him had ageist characteristics and appeared to favor younger workers while having a difficult time dealing with older workers.

24. Stovall's allegations set forth a prima facie case against Defendant. Under the *McDonnell Douglas Corp. v. Green,* framework, the Defendant must then enunciate a legitimate, non-discriminatory reason for its actions, and Defendant has alleged that Stovall violated its policies by sexually harassing a fellow employee. Although Defendant argues that Stovall sexually harassed his fellow worker in the cafeteria, the actions engaged in by Stovall do not rise to the level of sexual

harassment under Title VII. In *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 91 L.Ed.2d 49, 106 S.Ct. 2399 (1986), the Supreme Court held that hostile environment harassment can be actionable under Title VII of the Civil Rights Act of 1964, that, for hostile environment sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Vinson* at 477 U.S. 67.

25. The allegations against Stovall do not rise to this level. The incident was a one time incident that took place under circumstances in which no reasonable person could believe that Stovall did anything severe to the employee, and, since it happened only once, it could not have been pervasive. Moreover, when Stovall realized that Gruss was offended at the "tap" that occurred, he immediately apologized, and nothing further happened between Stovall and Gruss. Further, Gruss himself stated in his exit interview from Raytheon that the incident was not the reason for his departure.

26. Stovall has also shown that he was treated differently than younger workers, who were favored by Yamauchi. In the case of Krause, approximately ten years Stovall's junior, the circumstances are virtually identical, and Krause was not fired over the allegations against him until other allegations materialized from another female employee months later. Morerover, the other allegations Stovall makes against Yamauchi show that he favored younger workers in virtually every instance. Stovall has raised genuine issues as to material facts on the issue of proving a prima facie case of age discrimination. He has also raised fact issues on the quality of the company's investigation of him and the ageist mentality of the officials who terminated his employment.

27. Although Defendant states that Stovall was never replaced, according to Raytheon, the way his vacancy was handled appears to have been done to keep from hiring another higher paid older employee and to allow younger workers to absorb higher level responsibilities. Raytheon caused Stovall's duties to be absorbed by multiple members of the Materials Processing Team, virtually

all of whom were younger than Stovall. Genuine issues of material fact are raised by Stovall's claims.

### 2. Stovall can establish pretext.

**28.** Defendant next alleges that, even if Stovall can prove a prima facie case of discrimination, he cannot establish pretext. Once the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate legitimate, non-discriminatory reasons for any allegedly unequal treatment. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. After the employer articulates legitimate, non-discriminatory reasons, the burden shifts back to the plaintiff to prove that the employer's articulated reasons are a mere pretext for unlawful discrimination. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825. Although the burden of production shifts, the burden of persuasion remains continuously with the plaintiff. *McDonnell Douglas*, 411 U.S. at 803, 93 S.Ct. at 1825.

**29.** Defendant asserts that, because Stovall admits that he tapped Gruss with the cafeteria tray, he cannot prove that his termination was a pretext for Raytheon's unlawful discrimination. However, a plaintiff may prove his or her case of discriminaton either through direct or circumstantial evidence. *Urbano v. Cont'l Airlines, Inc.,* 138 F.3d 204, 206 (5th Cir. 1998). In this case, the more favorable treatment provided to younger workers like Krause and Yamauchi raised circumstantial evidence of pretext . Krause was not terminated when he was accused of harassment. Instead, he was demoted and allowed to keep his job. Similarly, Yamauchi was accused of improper conduct, and he was demoted, rather than being discharged. Both Krause and Yamauchi were approximately 10 years younger than Stovall. This constituted circumstantial evidence of pretext.

### 3. Stovall has not brought a retaliation claim.

30.     Defendant next alleges that Plaintiff failed to exhaust his remedies on his claim for retaliation. However, Stovall has not pled such a claim in this Civil Action.

### 4. Stovall has not brought a retaliation claim.

31.     Defendant next alleges that Plaintiff cannot establish a prima facie case of retaliation. However, Stovall has not pled such a claim in this Civil Action.

### 5. Stovall has not brought a retaliation claim.

32.     Defendant next alleges that Plaintiff has no evidence of pretext on his retaliation claim. However, Stovall has not pled such a claim in this Civil Action.

## VI.

## CONCLUSION

Based upon the above, the evidence in support of this Response, and the argument and authorities cited herein, Plaintiff respectfully requests that the Court deny the Motion as to Plaintiff's Age Discrimination claim in all respects and that his claims proceed to trial.

Respectfully submitted,

*/s/ David Fielding*
David Fielding
State Bar No. 06974500

David Fielding, PC
101 Summit Ave., Suite 1010
Fort Worth, Texas 76102
817-996-8673
682-250-7109 Facsimile
Email: dfielding@fieldingpc.com

**ATTORNEYS FOR PLAINTIFF
WILLIAM KIBBEY STOVALL**

**CERTIFICATE OF SERVICE**

16

  This is to certify that the foregoing instrument was sent via electronic mail, on the 25th day of March, 2024:

Stephanie Manning
Esteban Shardonofsky
Seyfarth, Shaw, LLP
Houston, Texas 77002.

                   */s/ David Fielding*
                   David Fielding